**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Colleen M. Engquist,<br><br>     Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin, Acting Commissioner, Social Security Administration,<br><br>     Defendant. | No. CV-11-02455-PHX-GMS<br><br><br>**ORDER** |

    Pending before the Court is the appeal of Plaintiff Colleen M. Engquist, which challenges the Social Security Administration's decision to deny benefits.  (Doc. 1.)  For the reasons set forth below, the Court vacates that decision and remands for further proceedings.

## BACKGROUND

    Plaintiff Colleen Marie Engquist claims that she has been disabled since October 3, 2006. (R. at 16.) She is around 50 years old and has a high school education. (*Id.* at 614.) Prior to the onset of her alleged disability, Engquist worked as a floral designer, a medical office receptionist, and a retail worker. (*Id.* at 132.) Engquist submitted a Title II application for disability and disability benefits on July 9, 2008. (R. at 16.) She then filed a Title XVI application for supplemental security income on January 15, 2009. (*Id.*) The Social Security Administration ("SSA") denied her claims on November 7, 2008, and again on February 3, 2009. (*Id.*) Engquist subsequently requested a hearing, which was

held on May 5, 2010, and continued on November 9, 2010, in Phoenix, Arizona. (*Id.*) On January 23, 2011, the Administrative Law Judge ("ALJ") issued her decision finding that Engquist was not disabled under sections 216(i) and 223(d) of the Social Security Act. (*Id.* at 24.)

To determine whether Engquist was disabled, the ALJ undertook the five-step analysis detailed at 20 C.F.R. §§ 404.1520(a) and 416.920(a).[1] (R. at 17.) She determined at the first step that Engquist had not engaged in substantial gainful activity since October 3, 2006, the alleged onset date. (*Id.* at 18.) The ALJ then found that Engquist had the following severe impairments: fibromyalgia, obesity, lumbar degenerative disc disease with spondylolisthesis, migraines, meniscal degeneration, a major depressive disorder, generalized anxiety disorder, and a panic disorder. (*Id.* at 19.) At step three, the ALJ determined that none of these impairments, either alone or in combination, met or equaled any of the SSA's listed impairments. (*Id.*)

At that point, the ALJ made a determination of Engquist's residual functional capacity ("RFC"),[2] concluding that Engquist could perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she may occasionally climb ladders,

---

[1] Under the test:

> A claimant must be found disabled if she proves: (1) that she is not presently engaged in a substantial gainful activity[,] (2) that her disability is severe, and (3) that her impairment meets or equals one of the specific impairments described in the regulations. If the impairment does not meet or equal one of the specific impairments described in the regulations, the claimant can still establish a prima facie case of disability by proving at step four that in addition to the first two requirements, she is not able to perform any work that she has done in the past. Once the claimant establishes a prima facie case, the burden of proof shifts to the agency at step five to demonstrate that the claimant can perform a significant number of other jobs in the national economy. This step-five determination is made on the basis of four factors: the claimant's residual functional capacity, age, work experience and education.

*Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007) (internal citations and quotations omitted).

[2] RFC is the most a claimant can do despite the limitations caused by her impairments. *See* S.S.R. 96-8p (July 2, 1996).

ropes and scaffolds; occasionally crouch and crawl; and should avoid concentrated exposure to extreme cold and humidity. She further found that Engquist was limited to work that requires her to understand, remember and carry out simple and detailed instructions; maintain attention in two hour segments; interact appropriately without undue distraction with co-workers; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in a routine work setting. (*Id.* at 20.) Still at step four, the ALJ concluded that Engquist retained the RFC to perform her past relevant work as a floral designer, a cashier, a medical records clerk, and a pharmacist technician. (*Id.* at 24.) The ALJ did not reach step five and found that Engquist was not disabled. (*Id.*) The Appeals Council declined to review the decision. (*Id.* at 3-6.)

Engquist filed the Complaint in this action on December 12, 2011, seeking the Court's review of the ALJ's denial of benefits. (Doc. 1.) The matter became fully briefed on December 10, 2012. (Docs. 18, 21, 29.)

## DISCUSSION

### I.   LEGAL STANDARD

A reviewing federal court will address only the issues raised by the claimant in the appeal from the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). A federal court may set aside a denial of disability benefits when that denial is either unsupported by substantial evidence or based on legal error. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "more than a scintilla but less than a preponderance." *Id.* (quotation omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Id.* (quotation omitted).

Subject to the Ninth Circuit's standards in particular cases, the ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's

- 3 -

conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted).

## II.    ANALYSIS

Engquist argues that the ALJ erred by: (A) improperly discounting the opinion evidence of her treating physicians, (B) improperly rejecting Engquist's own statements regarding the severity of her symptoms, (C) improperly discounting lay witness testimony, and (D) failing to consider the effect of other documented impairments. The Court will address each argument in turn.

### A.    Opinion Evidence

#### 1.    Mental Impairments

The ALJ found that Engquist suffered from the following mental impairments: a major depressive disorder, generalized anxiety disorder, and a panic disorder. The Parties discuss two people who examined Engquist and their opinions: the SSA's examining physician Dr. Sharon Steingard and Engquist's treating psychiatric Nurse Practitioner Lori Danker. Engquist claims Dr. Steingard's opinions required a finding of disability and that the ALJ improperly discounted Danker's opinions.

##### a.    Dr. Steingard

Dr. Sharon Steingard was the SSA's examining doctor. SSA physicians are experts. *See* SSR 96-6p. Dr. Steingard made several conclusions regarding Engquist's ability to work that are relevant to the current dispute. First, she found the same mental impairments cited by the ALJ: major depression, single episode, without psychosis; panic disorder without agoraphobia; and generalized anxiety disorder. (R. at 245.) She then opined that Engquist "is likely to have some trouble with maintaining her concentration over the course of a full workweek due to generalized anxiety as well as depression. During periods of panic, she is going to be unable to complete required tasks on a job."

(*Id.* at 246.) She also noted that Engquist "is able to understand a variety of simple and repetitive tasks." (*Id.*) Finally, she stated that Engquist "is going to have more problems with multitasking or complicated tasks. I think she will likely have some problems with her pace and persistence and adaptation over the course of a full 40-hour workweek." (*Id.*) She did not give an ultimate opinion on Engquist's ability to work.

The ALJ apparently accepted most of these conclusions and gave "some" weight to Dr. Steingard's opinion. (*Id.* at 23.) She noted that Engquist could "maintain attention in 2 hour segments", (*id.* at 20), which appears to take Dr. Steingard's conclusions on the "likely" problems with pace, persistence, concentration, and adaption that Engquist would face in a full-time work environment and translate them into a limitation that can be incorporated into an RFC. Engquist claims the ALJ could not find her capable of only "maintain[ing] attention in 2 hour segments" and then find her not disabled, especially in light of Dr. Steingard's findings. SSR 96-8p details the metric intended for capture in the RFC: "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." (emphasis in original). Engquist's argument boils down to two alleged errors: (1) whether the ALJ could find Engquist capable of work in light of the findings of Dr. Steingard; and (2) whether the ALJ improperly ruled that Engquist could do sustained light work for eight hours a day, five days a week, when she previously found that Engquist could "maintain attention in 2 hour segments".

Dr. Steingard opined that Engquist would face some difficulties if she returned to work. Nevertheless, Dr. Steingard's opinion describes "some trouble" and "some problems", and does not state that Engquist was unable to work. The ALJ's various limitations in the RFC would appear to account for Dr. Steingard's concerns. But Dr. Steingard also opined that panic attacks would render Engquist "unable to complete required tasks on a job." (*Id.* at 246.) The ALJ does not expressly address the panic

attacks and their frequency in her decision. Nevertheless, the portions of the record cited by Engquist shed some light on the regularity of the attacks. Nurse Practitioner Danker reported on July 24, 2008, that Engquist was experiencing panic attacks "2 times [this] past week." (*Id.* at 273.) Those attacks were "better" with medication on November 21, 2008. (*Id.* at 295.) Nurse Practitioner McNew relayed on January 12, 2010, that she was changing Engquist's medication because she was "still having some panic daily unprecipitated." (*Id.* at 523.) At the hearing held on May 5, 2010, Engquist testified that she gets "anxiety attacks . . . a couple of times a week." (*Id.* at 617-18.) Thus, the evidence tends to show that panic attacks occurred a couple of times a week. Notably, the vocational expert stated that an individual would not be able to work only if she experienced panic attacks "more than a couple of times a week." (*Id.* at 631.)

Consequently, it seems the ALJ incorporated Dr. Steingard's concerns about work pressures and panic attacks into her RFC limitation to jobs that require Engquist to "maintain attention in 2 hour segments", with presumed breaks in between. Dr. Adrianne Gallucci, a state agency physician, concluded that Engquist retained that capacity. (*Id.* at 224.) It was reasonable for the ALJ to adopt Dr. Gallucci's two hour solution as a means to reconcile Dr. Steingard's statements about Engquist's potential problems in a work environment with the evidence in the record about the frequency and intensity of Engquist's symptoms. Engquist claims that there is no rational basis for assuming that the panic attacks or other mental impairments occur on a two hour basis. The purpose of the breaks would not be to allow Engquist to have the attack; instead, the breaks are apparently mandated to alleviate the work pressures that contribute to Engquist's challenges. Dr. Steingard offered no opinion as to the frequency of Engquist's panic attacks, and the evidence is that those attacks, when they were not controlled by medication, occurred two times a week. That level of frequency was not disabling according to the vocational expert. The ALJ's accommodation in her RFC analysis, while imperfect, reasonably incorporated the concerns of Dr. Steingard. Therefore, she did not improperly deal with Dr. Steingard's opinions.

1

2                          **b.     Nurse Practitioner Danker**

3          Danker is a non-acceptable medical source and "cannot establish the existence of

4   an impairment." SSR 06-03p. Since the ALJ already found that Engquist has a number of

5   mental impairments, however, a nurse practitioner's opinion is relevant evidence because

6   it "may provide insight into the severity of the impairment(s) and how it affects the

7   individual's ability to function." *Id.* An ALJ can discount an opinion from a non-

8   acceptable medical source like Peterik so long as she gives "reasons 'germane' to each

9   witness for discounting." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

10         Danker was the Nurse Practitioner who worked with Engquist for a period of time.

11  Danker filled in a form asking her to estimate Engquist's ability to perform certain work

12  related activities on a scale from "none" to "severe." (R. at 420-21.) She found that

13  Engquist suffered "moderately severe"[3] impairment with regard to "[c]onstruction of

14  interests" and "[r]espond to customary work pressure." (*Id.*) She also opined that

15  Engquist had a "moderate"[4] impairment for "[r]estriction of daily activities",

16  "[d]eterioration in personal habits", "[u]nderstand, carry out, and remember instructions",

17  "[r]espond appropriately to supervision", "[p]erform complex tasks", "[p]erform

18  repetitive tasks", and "[p]erform varied tasks". (*Id.*) In Danker's treatment notes, there

19  were reports of regular panic attacks, but also that medication was "helpful". (*Id.* at 273-

20  78.) While medication became "less effective" over time, and changes were necessary,

21  (*id.* at 292), new medication again proved "helpful." (*Id.*) When presented with

22  limitations specified by Danker, the state's vocational expert testified that an individual

23  with those limitations would not be able to perform any of Engquist's past work. (*Id.* at

24  632.) The key to the vocational expert's testimony, however, was the frequency of the

25  panic attacks, which was presented to the expert as several times a week—more than a

26  _____

27         [3]"[A]n impairment which seriously affects ability to function." (R. at 421.)

28         [4] "[A]n impairment which affects but does not preclude ability to function. (*Id.*)

couple of times a week. (*Id.* at 631-32.)

The ALJ, though, gave "little" weight to Danker's opinion because "it is unsupported by Ms. Danker's own treatment notes, which show a less severe level of impairment." (R. at 23.) The ALJ cites several instances where Danker observed that Engquist "responded well to treatment." (*Id.* at 22.) Those notes reveal that medication was "helpful" in treating Engquist's condition including her panic attacks. Moreover, the effectiveness of medication in treating Engquist's symptoms was fairly consistent in Danker's notes. While Engquist may argue that the fact that medication helped Engquist's symptoms is not necessarily inconsistent with the Danker's disability opinion, there is evidence to support the ALJ's determination. That is all that is required to affirm the ALJ's determination. *See Thomas*, 278 F.3d at 954. Inconsistency with treatment notes is a germane reason and there is evidence to support it. Therefore, the ALJ did not improperly discount Danker's conclusions on Engquist's ability to work.

### 2.      Physical Impairments

The ALJ found that Engquist suffered from the following severe physical impairments: fibromyalgia, obesity, lumbar degenerative disc disease with spondylolisthesis, migraines, meniscal degeneration. (R. at 19.) Engquist's claim to benefits, however, focuses almost exclusively on her fibromyalgia. She cites two persons, one a doctor and one a physician's assistant, whom she saw for her fibromyalgia: Dr. Trent Smith, her treating rheumatologist, and Physician Assistant Michael Peterik.

### a.      Dr. Smith

The ALJ gave "little weight" to Dr. Smith's opinion—expressed in a letter—that Engquist was disabled. She cited three reasons: (1) Dr. Smith recognized that he "could not objectively measure the claimant's level of pain and fatigue", (2) Dr. Smith stated that he "had not observed the patient in a home, work or simulated environment so that he could determine the impact of symptoms in relation to the patient's activities", and (3) Dr. Smith's opinion was "not supported by the overall objective evidence."

It is well-established that the opinion of a treating physician is given more weight

than non-treating and non-examining medical sources. *See Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); 20 C.F.R. § 404.1527. When the treating doctor's opinion is uncontradicted, the ALJ can reject those conclusions only for "'clear and convincing' reasons." *Lester*, 81 F.3d at 830 (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991)). Even when another doctor disagrees with the treating doctor's opinion, the ALJ can reject the treating doctor's conclusions only when he provides "'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)). Some of the factors an ALJ may consider when deciding whether to reject the opinion of a treating doctor are the "'[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Orn*, 495 F.3d at 631 (quoting 20 C.F.R. § 404.1527(c)(2)(i)-(ii)). In addition, the ALJ always examines "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion." *Id.*

Opinions on the ultimate issue of disability, however, are not medical opinions, and do not receive the same level of deference. 20 C.F.R. § 404.1527(d). That issue is reserved for the ALJ. *Id.* Although the ALJ is not "bound" by a controverted opinion of the treating physician on disability, she can reject that opinion only by citing "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998); *Lester*, 81 F.3d at 830. In reality, then, the "reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion." *Reddick*, 157 F.3d at 725.

Dr. Smith penned a letter to the SSA on April 18, 2010, in which he stated that he was "unable to make specific statements" "[i]n response to questions about disability." (R. at 521.) He noted that the level of impairment was directly related "to a patient's level

of pain and fatigue, which I cannot objectively measure." (*Id.*) Dr. Smith likewise recognized that he "ha[s] not observed the patient in a home or work environment, or simulate environment, so cannot determine the impact of symptoms in relation to the patient's activities." (*Id.*) He concluded that

> [i]n this situation, a determination of disability also needs to be based on the credibility of the patient's statements and a desire to believe or not believe the patient, in the absence of 'objective' measurements. The patient has been consistent and believable in the patient's reports of the patient's level of pain, fatigue, and cognitive problems, and limitations on the patient's daily function due to these symptoms. I do not question the patient's assertion that the patient is disabled for all competitive work requirements.

(*Id.*) It is true that fibromyalgia is a particularly enigmatic disease that does not produce positive laboratory tests or similar objective evidence. *See Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004) ("Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community. The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms."); *Jordan v. Northrup Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004) (fibromyalgia's "symptoms are entirely subjective. There are no laboratory tests for [its] presence or severity"), *overruled in non-relevant part by Abatie v. Alta Health & Life Ins. Co.*, 258 F.3d 955, 969 (9th Cir. 2006) (en banc); *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 796 (9th Cir. 1997) (same). SSR 12-02p[5] recognizes the difficulties in finding strong objective evidence of fibromyalgia and emphasizes reliance on a physician—like Dr. Smith—who has been treating the patient for some time.

Nevertheless, the existence of fibromyalgia and related ailments is not

---

[5] Social Security Rulings (SSRs) "do not carry the 'force of law,' but they are binding on ALJs nonetheless." *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009). They "'reflect the official interpretation of the [SSA] and are entitled to some deference as long as they are consistent with the Social Security Act and regulations.'" *Id.* (alteration in original) (quoting *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006)).

synonymous with a finding of disability. Dr. Smith noted that he had no objective evidence that Engquist suffers from her impairments, but that her symptom reporting has largely been consistent. (R. at 521.) But the ALJ's opinion does not question the presence of fibromyalgia; indeed, the ALJ determined that Engquist's fibromyalgia was a severe impairment, meaning "it significantly limits [her] ability to perform basic work activities." (*Id.* at 17, 19.) Disability, however, is a function of how much Engquist's fibromyalgia affects her ability to work. The ALJ's reason for discounting Dr. Smith's opinion on the issue of disability was not the absence of objective evidence that Engquist had fibromyalgia, but the absence of objective evidence from Dr. Smith that the fibromyalgia rendered her disabled. Dr. Smith himself acknowledged that he had no basis on which to evaluate the effect of Engquist's fibromyalgia on her ability to work. (*Id.* at 521.)

To the extent Dr. Smith's letter could be read as offering an opinion that Engquist was disabled, he is basically parroting his patient's own opinion of disability: "The patient has been consistent and believable in the patient's reports of the patient's level of pain, fatigue, and cognitive problems, and limitations on the patient's daily function due to these symptoms. I do not question the patient's assertion that the patient is disabled for all competitive work requirements." (*Id.*) Determining the severity of fibromyalgia necessarily involves significant reliance on the claimant's description of the symptoms, the opinions of the doctor—especially a specialist like a rheumatologist—should be given great weight. *Benecke*, 379 F.3d at 595 n.4 ("Specialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community."); 20 C.F.R. § 404.1527(d)(5) (specialist opinions given even greater weight); SSR 12-02p. Still, the opinions—especially those on the issue of disability—must have a basis in the medical evidence for the ALJ to be required to give them credit. Dr. Smith's opinion on disability lacks such a basis, and he acknowledged as much. It was not based on Dr. Smith's specialized knowledge—just his own evaluation of the veracity of Engquist's statements, which the ALJ was equally qualified to

undertake. Therefore, the ALJ did not act improperly in rejecting Dr. Smith's disability opinion for lacking an objective foundation. That was a specific and legitimate reason.

The second reason the ALJ gave for rejecting Dr. Smith's opinion on Engquist's ability to work was that Dr. Smith had never observed Engquist around the house and in her personal life. For the reasons discussed above, this was also a specific and legitimate reason for rejecting Dr. Smith's opinion—to the extent there was one—that Engquist's physical symptoms were disabling. In fact, Dr. Smith himself recognized that he was unable to provide an opinion on disability because he had not ever observed how those symptoms affected Engquist in daily life. (R. at 521.) This was therefore also an appropriate basis for rejection.

The ALJ finally rejected Dr. Smith's opinion on disability for lack of support in "the overall objective evidence." (*Id.* at 23.) While this generalized catch-all has received criticism at the appellate level, see, e.g., *Lester*, 81 F.3d at 834 ("General findings are insufficient" when the ALJ must provide specific reasons for discounting), the ALJ had just discussed in her decision her evaluation of several reports by Drs. Smith, Keith Cunningham, and Sherif Nasef as it related to claimant's fibromyalgia. (R. at 21.) Those reports over a significant period of time state that Engquist's symptoms were controlled with various treatments and medications, (*id.* at 248, 511, 540, 543) and further note that, at one point, Engquist declined to describe her condition as fibromyalgia, but instead referred to it as muscle soreness (*id.* at 248). Based on these records, the ALJ could conclude that an opinion from Dr. Smith that Engquist was disabled lacked sufficient support in the medical evidence. Inconsistency and lack of support in the overall medical evidence is a specific and legitimate reason for rejecting a treating physician's opinion on disability. The ALJ set forth those instances of inconsistency in her general recitation of the medical evidence at the beginning of the section where she evaluates the medical opinions. It appears that her citation to "the overall objective evidence" is a shorthand reference to this earlier discussion. While her analysis could be clearer and therefore more likely to be affirmed if she cited the evidence when she referenced it in her

evaluation of the opinion evidence, the Court has looked at the decision as a whole and found sufficient reason to uphold it.

In sum, the ALJ's rejection of Dr. Smith's opinions on the severity of fibromyalgia's impact on Engquist was not improper. She cited "specific and legitimate reasons supported by substantial evidence in the record" in discounting the opinion of a treating specialist on the ultimate issue of disability. *Reddick*, 157 F.3d at 725.

### b.    Physician Assistant Peterik

The ALJ likewise discounted the opinion of Physician Assistant Peterik that Engquist was unable to "work 8 hours a day, 5 days a week on a regular and consistent basis." (R. at 417-19.) The ALJ assigned "little weight" to that opinion "because it is not supported by the objective medical evidence, including Mr. Peterik's own treatment notes."

As an initial matter, Peterik's status as a physician's assistant places him on a different level than Dr. Smith. As discussed above, physician's assistants are not "acceptable medical sources" and cannot therefore give "medical opinions." 20 C.F.R. §§ 404.1513, 404.1527; *see also* SSR 06-03p. An ALJ can discount an opinion from a non-acceptable medical source like Peterik so long as he gives "reasons 'germane' to each witness for discounting." *Molina*, 674 F.3d at 1111.

The ALJ gave germane reasons for rejecting Peterik's opinions. An examination of Peterik's report reveals bases on which the ALJ could find inconsistency between his determination of disability and his notes. Peterik found that Engquist could perform all the specified physical activities in work setting (such as use of limbs, bend, crouch, reach) frequently or continuously, and crawling or kneeling occasionally. (R. at 418.) No other restrictions were noted and he described Engquist's pain as moderate. (*Id.* at 419.) These observations are inconsistent with a finding of total disability. A lack of consistency is an appropriate basis for discounting non-medical source opinion. 20 C.F.R. § 404.1527(c)(4). Moreover, it is not clear that Peterik ever saw or treated Engquist for her physical ailments. The ALJ did not improperly discount Peterik's opinion.

1    In sum, the ALJ did not err in her evaluation of the opinion evidence on the effect

2 of Engquist's physician impairments.

3    **B.    Engquist's Statements**

4    Engquist testified at the SSA hearing on the degree of her mental and physical

5 impairments. She described an inability to keep up with the pace of work, frequent

6 anxiety attacks, difficulties with her memory and concentration, and physical pain from

7 her fibromyalgia and other ailments. (R. at 615-26.) The ALJ articulated four reasons for

8 finding much of her testimony incredible: (1) Engquist's "statements concerning the

9 intensity, persistence and limiting effects of [her] symptoms are not credible to the extent

10 they are inconsistent with the above residual functional capacity assessment"; (2)

11 Engquist once rode her son's scooter; (3) Engquist "engaged in multiple activities of

12 daily living such as watching TV, reading books, doing household chores at home and

13 going shopping for groceries and cooking"; and (4) "[t]he evidence . . . indicated that

14 treatment the claimant received effectively treated her symptoms." (R. at 21, 23.) The

15 ALJ did not find any evidence of malingering on the part of Engquist.

16    The legal standard governing claimant credibility is a matter of dispute between

17 the parties. The Commissioner relies on *Bunnell v. Sullivan*, 947 F.2d 341 (9th Cir. 1991)

18 (en banc), where the Ninth Circuit set out to "determine the appropriate standard for

19 evaluating subjective complaints of pain in Social Security disability cases." *Id.* at 342.

20 The *Bunnell* Court opined that once there has been objective medical evidence of an

21 underlying impairment, the ALJ must make specific findings, supported by the record,

22 for why he rejected the claimant's testimony on the severity of the pain. *Id.* at 345-46.

23 This is to ensure that the ALJ "did not 'arbitrarily discredit a claimant's testimony

24 regarding pain.'" *Id.* (quoting *Elam v. R.R. Retirement Bd.*, 921 F.2d 1210, 1215 (9th Cir.

25 1991)). Thus the Commissioner asserts that the standard governing claimant credibility is

26 a specific finding standard, which it claims is more in line with the overall "substantial

27 evidence" standard that governs these cases.

28    Many panels of the Ninth Circuit, however, have held that if there is objective

medical evidence of an underlying impairment, "and there is no evidence of malingering, then the ALJ must give 'specific, clear and convincing reasons' in order to reject the claimant's testimony about the severity of the symptoms." *Molina*, 674 F.3d at 1112 (quoting *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)); *see also, e.g.*, *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The Commissioner claims that these cases, along with the many others referenced in Engquist's Reply, have overruled the standard articulated in *Bunnell* in violation of the Ninth Circuit rule that only en banc panels can overrule existing precedent. *See United States v. Camper*, 66 F.3d 229, 232 (9th Cir. 1995). That is not the case. *Bunnell* articulated a general standard for dealing with claimant testimony. The many subsequent cases have addressed a subset of cases where there is also no evidence of claimant malingering. They have articulated a "clear and convincing" standard for those situations. This Court cannot sit in judgment of the application of that standard, which is clearly the standard that governs claimant credibility in this circuit. Accordingly, the ALJ's reasons for finding Engquist's testimony incredible must be "clear and convincing."

The first reason—that Engquist's statements "are not credible to the extent they are inconsistent with the above residual functional capacity assessment"—is circular. The ALJ cannot determine the RFC and then look at Engquist's statements; the RFC is supposed to incorporate those statements. *See Leitheiser v. Astrue*, No. CV 10–6243–SI 2012 WL 967647 (D. Or. March 16, 2012) ("Dismissing a claimant's credibility because it is inconsistent with a conclusion that must itself address the claimant's credibility is circular reasoning and is not sustained by this court."); *Carlson v. Astrue*, 682 F. Supp. 2d 1156, 1167 (D. Or. 2010) (same). It was improper to reject Engquist's testimony on that basis.

The second and third reasons are related and describe Engquist's activities around her home. The ALJ states that Engquist "engaged in multiple activities of daily living such as watching TV, reading books, doing household chores at home and going shopping for groceries and cooking." (*Id.*) Specifically, Engquist stated that most of her

1  day is spent watching TV and reading. (*Id.* at 155-60.) She prepares meals a "couple of

2  times a week." (*Id.* at 157.) She does the laundry about two times a week, but her kids

3  handle other chores. (*Id.*) Enquist goes to the grocery store, but has to "go slow and . . .

4  hold to cart handle usually." (*Id.* at 159.) Enquist's involvement in those activities is not

5  a clear and convincing reason for finding her testimony incredible.

6         The Ninth Circuit has expressed skepticism that a claimant's pursuit of a sense of

7  normalcy is itself evidence of non-disability. *See, e.g.*, *Cohen v. Sec. of Dep't of Health &*

8  *Human Servs.*, 964 F.2d 524, 530-31 (9th Cir. 1992) (ruling that a claimant should not be

9  penalized for attempting to maintain some sense of normalcy in her life); *Cooper v.*

10 *Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (noting that a disability claimant need not

11 "vegetate in a dark room" in order to be deemed eligible for benefits); *Fair v. Bowen*, 885

12 F.2d 597, 603 (9th Cir. 1989) ("Many home activities are not easily transferable to . . .

13 the more grueling environment of the workplace, where it might be impossible to

14 periodically rest or take medication."). Nevertheless, "if, despite his claims of pain, a

15 claimant is able to perform household chores and other activities that involve many of the

16 same physical tasks as a particular type of job, it would not be farfetched for an ALJ to

17 conclude that the claimant's pain does not prevent the claimant from working." *Fair v.*

18 *Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). The claimant needs to "spend a substantial

19 part of the day engaged" in such activities for the ALJ to have grounds for discounting

20 the claimant's testimony. *Id.* Moreover, "[t]he ALJ must make 'specific findings relating

21 to [the daily] activities' and their transferability to conclude that a claimant's daily

22 activities warrant an adverse credibility determination." *Orn*, 495 F.3d at 639 (quoting

23 *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)).

24        Enquist's engagement in the cited activities falls short of the necessary level.

25 "[R]eading [and] watching television . . . are activities that are so undemanding that they

26 cannot be said to bear a meaningful relationship to the activities of the workplace." *Id.*

27 While Enquist stated that she did the laundry, prepared meals, and went grocery

28 shopping, she performed those tasks infrequently—at most a few times a week. That type

of limited involvement does not "bear a meaningful relationship to the activities of the workplace." *Id.* Engquist apparently relies heavily on her teenage children to assist with the regular household chores and performs those chores herself only now and then. (R. at 155-62.) That level of activity is not a clear and convincing reason for rejecting Engquist's testimony. *See Reddick*, 157 F.3d at 722 ("Only if the level of activity were inconsistent with Claimant's claimed limitations would these activities have any bearing on Claimant's credibility."); *Molina*, 674 F.3d at 1112-13 (an ALJ may properly find incredible the testimony of a claimant who asserts total disability but regularly participates in everyday activities). In *Berry v. Astrue*, relied on by the Commissioner, the Ninth Circuit accepted the ALJ's credibility decision where there were wide discrepancies between what claimant alleged (sit/drive for only one hour and then lie down, rely on everyone else for getting stuff) and what he had done (active socially, camping, hiking, daily walks). 622 F.3d 1228, 1234-35 (9th Cir. 2010). The ALJ cites no such difference here. In addition, the ALJ failed to make specific findings relating to Engquist's daily activities and their transferability to a particular type of job. The same reasoning applies to the ALJ's citation of a single incident where Engquist crashed while riding her son's scooter. (R. at 23.) This happened during the summer of 2008 (*id.* at 355), and there is no evidence that Engquist continued to drive similar vehicles. A single incident does not bear on Engquist's ability to perform work on a consistent basis. Therefore, Engquist's activities fall short of a clear and convincing reason supported by substantial evidence in the record.

The final basis is that Engquist's symptoms were effectively treated with medication. "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). Here, the ALJ has provided a clear and convincing reason for finding incredible Engquist's testimony regarding the effects of her impairments. That reason has support in the evidentiary record. As discussed above, Dr. Smith and Nurse Practitioner Danker reported that medication

helped Engquist control both her physical and mental symptoms. (R. at 540-45, 560-65.) Her psychiatric progress reports stated that "client feels her medication regime is very effective." (*Id.* at 560.) Engquist cites other evidence that medication did not control all of her symptoms.   There is nevertheless sufficient evidence to support the ALJ's conclusion that medication was sufficiently effective. That ends the inquiry.

While some of the grounds cited by the ALJ are not clear or convincing, one ground is and has adequate evidentiary support. Engquist's medical providers recorded that medication was effective in controlling her symptoms. That is a sufficiently clear and convincing reason for discounting Engquist's testimony as to the severity of her symptoms. Therefore, that decision was not in error.

**C.    Lay Witness Testimony**

Engquist next claims that the ALJ improperly discounted the lay testimony of her friend, Thomas Logan. "In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006); *see also* 20 C.F.R. § 404.1513(d)(4) (can use evidence from other sources to "show the severity of [the] impairment"). "If an ALJ disregards the testimony of a lay witness, the ALJ must provide reasons 'that are germane to each witness.'" *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)). Those reasons must be specific to each witness. *Id.*

Logan filled out a questionnaire on his observations of Engquist around her home. (R. at 168-70.) He has known Engquist for 14 years and spends time with her daily. (*Id.* at 168.) He notes that she sometimes struggles with the stairs, does not do much cooking, and does not go out socially. (*Id.* at 168-70.) The ALJ gave this testimony "appropriate weight", without specifying what weight that was. (*Id.* at 23.) Logan's testimony adds little to the picture. The ALJ must provide germane reasons when he rejects, not accepts, lay witness testimony. While the ALJ may have erred in not parsing out how she considered Logan's questionnaire, the information provided therein is duplicative of

evidence provided by Engquist herself. In such situations, the ALJ's failure to be specific is harmless at worst. *See Molina*, 674 F.3d at 1117-22 (failure to discuss testimony of family members while rejecting claimant's own testimony was harmless when testimony "did not describe any limitations beyond those [the claimant] herself described"). This claim does not provide a basis to disturb the ALJ's conclusion.

### D.    Other Impairments

Finally, Engquist cites several physical ailments that the ALJ failed to discuss when determining her RFC. These include her hand impairments, inability to sleep, and headaches. There is objective medical evidence that Engquist had a form of osteoarthritis and carpal tunnel syndrome in her wrist, sleeping trouble, and fairly regular headaches. (R. at 303, 307, 311, 352, 354, 369, 373, 414, 464, 472, 517-18.) The ALJ found that Engquist had migraines that created to a severe impairment, but did not describe Engquist's wrist problems or sleep issues. (*Id.* at 19.) She then discounted the effect of the migraines because medication was helping at two different doctor visits. (*Id.* at 22.) Nevertheless, Engquist testified to her wrist and hand problems at the hearing, and the ALJ questioned her about it. (*Id.* at 615, 620, 641-42.) No discussion of the arthritis or carpal tunnel syndrome appeared in the ALJ's decision.

The Ninth Circuit has described a failure to discuss relevant symptoms when determining a claimant's RFC as inconsistent with the ALJ's mission to determine the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs", 20 C.F.R. § 404, Subpt. P, App. 2. *See Reddick v. Chater*, 157 F.3d 715, 724-25 (9th Cir. 1998) (failure to take into account chronic fatigue syndrome). As cited above, medical evidence exists that Engquist had serious wrist and hand problems. The ALJ failed to properly consider these impairments in its analysis. That error was not harmless because it may have affected the ALJ's evaluation of Engquist's RFC, which informs the entire disability determination. Indeed, that RFC specifies that Engquist "may occasionally climb ladders, ropes and scaffolds, [and] occasionally crouch and crawl." (*Id.* at 20.) Those activities would likely be

severely hampered by carpal tunnel syndrome or osteoarthritis. Furthermore, the ALJ's decision at step four was that Engquist "is capable of performing past relevant work as a floral designer and cashier, a medical records assistant and pharmacist tech." (*Id.* at 24.) Yet Engquist testified that her performance at those jobs was not satisfactory to her employers, due partly to the hand and wrist conditions. (*Id.* at 641.) The ALJ's failure to evaluate those impairments may have affected the RFC.

## III.   REMEDY

The ALJ erred by failing to discuss certain impairments presented by Engquist and supported by the record. The Court must therefore vacate the ALJ's conclusions at step four.

Having decided to vacate the ALJ's decision, the Court has the discretion to remand the case either for further proceedings or for an award of benefits. *See Reddick*, 157 F.3d at 728. The rule in this Circuit is that the Court should:

> credit[] evidence and remand[] for an award of benefits where (1) the ALJ has failed to provide legally sufficient reasons for rejecting [certain] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen*, 80 F.3d at 1292.

Remand for further proceedings is appropriate here. Much of the ALJ's decision had sufficient support; however, she did fail to appropriately consider certain evidence. The ALJ is the appropriate factfinder and a remand would allow the ALJ to correct the defect in the proceedings. *See Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990).

## CONCLUSION

The Court remands this case to the Commissioner for consideration of the effect on Engquist's RFC of her hand and wrist injuries on Engquist's RFC.

/ / /

/ / /

1       **IT IS THEREFORE ORDERED** that the ALJ's decision is **VACATED** and this

2 case is **REMANDED** for further proceedings.  The Clerk of Court is directed to enter

3 judgment accordingly.

4       Dated this 8th day of April, 2013.

G. Murray Snow
United States District Judge